The Jacksonville, Louisville and St. Louis Railway Company

*v.*

The Louisville and Nashville Railroad Company.

*Filed at Mt. Vernon June 19, 1894.*

1. CONTRACT—*construction.* A written contract must be given the meaning understood and intended by the parties at the time of its execution, and where the words "terminal facilities," as used in a railroad lease, have a meaning understood by railroad men, it will be presumed that those words were employed by the parties to the contract to be interpreted in accordance with such general understanding by railroad men.

2. A lease between two railway companies provided for the payment of rent for the use of a part of the track of the lessor company and for terminal facilities. The lessor company switched cars for the lessee company over tracks leading to the shops of a car works company, and sought to recover switching charges therefor, in addition to the amount agreed in the contract to be paid for terminal facilities: *Held,* that the car works track was not a part of the lessor's terminal facilities, and that switching cars over it to and from the shops was a service separate and distinct from the services included in the contract, and that the lessor was entitled to recover the amount such separate service was reasonably worth.

3. LANDLORD AND TENANT—*liability of successor of lessee for rent.* Where the lessee of a railroad agrees, on behalf of itself and its successors and assigns, to comply with the terms of the lease, and, among other things, to pay the rent reserved, and other charges, a person or company who succeeds to the rights of the lessee, and continues to use the leased premises as the lessee had done, will become liable to pay the rent specified in the lease to the lessor.

4. In an action by a railway company against the successor of its lessee, the court instructed the jury, on behalf of the plaintiff, that if they believe, from the evidence, that the defendant is the successor of the lessee, and, as such successor, came into possession of the property, rights and franchises of the lessee, and that the defendant, since coming into such possession, had been operating such railway and running its trains over the plaintiff's railroad, and using the terminal facilities of the plaintiff for freight and passenger business, and had been furnished with supplies, etc., and that defendant has claimed the right, under the contract of leasing, to operate its trains over plaintiff's railroad between the points named in the lease, and to use

plaintiff's terminal facilities in its business, then the defendant is liable to the plaintiff for such sum as they might find, from the evidence, was due, under the original lease, for rent of track, etc.: *Held*, that the instruction was not erroneous.

5. In an action by the lessor against one as the successor of the lessee, if both parties recognized and acted under the contract of leasing as a valid and binding contract between them during the time the defendant used and occupied plaintiff's property, no formal assignment of the lease by the lessee will be necessary to a recovery under it by the plaintiff for a breach of its conditions.

6. SAME—*recovery of rent under common counts.* In an action by the lessor of a railroad, under the common counts, the plaintiff is not bound to prove a special contract, in order to recover a reasonable price for the use and occupation of its property.

APPEAL from the Appellate Court for the Fourth District;— heard in that court on appeal from the Circuit Court of Jefferson county; the Hon. E. D. YOUNGBLOOD, Judge, presiding.

This was an action of assumpsit, in the circuit court of Jefferson county, brought by appellee, to recover certain indebtedness, against appellant, alleged to be due and unpaid. The declaration contained the common counts and one special count, the latter being upon a contract therein set out, entered into between appellee and the Jacksonville Southeastern Railway Company, April 15, 1888, and alleging that appellant, as successor to the rights, property and franchises of the Jacksonville Southeastern Railway Company, became, under said contract, liable to appellee for the use and occupation of its railroad tracks between Drivers station and Mt. Vernon, for the use of its terminal facilities, passenger and freight depots at Mt. Vernon, for labor, supplies and materials furnished, and for switching cars for appellant to and from the car shops at that place, to pay the several amounts therein alleged to be due and owing. To the declaration the defendant pleaded the general issue, and trial was had by jury, resulting in verdict and judgment against appellant for $5972.88. On appeal to the Appellate Court this judgment was affirmed.

Messrs. Morrison & Worthington, for the appellant.

Mr. J. M. Hamill, for the appellee.

Per Curiam : It will not be necessary for us to enter upon any extended discussion of the questions presented upon this record for our determination. A careful and painstaking consideration has satisfied us that the conclusion reached by the Appellate Court was correct, and the following opinion of that court has been adopted, as meeting the objections raised and as appropriately expressing the views entertained by us upon questions of law involved in the case :

Green, J. : "This was a suit in assumpsit, by appellee, against the appellant, brought to recover rent of track, rent of depots and terminal facilities at Mt. Vernon, for supplies, material and labor, and for switching cars by appellee for appellant to and from the shops of a company in Mt. Vernon engaged in the business of manufacturing and selling railroad cars. * * * The amount recovered is made up of $1250 for rent of the five miles of appellee's track between Drivers and Mt. Vernon, from December 1, 1890, to May 1, 1891; $3069.67 rent of depots and terminal facilities at Mt. Vernon, and supplies, materials and labor furnished by appellee from October 4, 1890, to May 31, 1891; and $1653.21 for switching cars by appellant to and from the Mt. Vernon Car Shops, from October 4, 1890, to November 10, 1891.

"The evidence shows that appellee furnished the trackage, depots, terminal facilities, supplies, materials and labor during the periods respectively above mentioned ; that the prices charged, and so allowed by the jury, were correct, and in accordance with the terms of the foregoing contract, and that the respective amounts so allowed were due and unpaid to appellee when this suit was commenced. The evidence also shows that from October 4, 1890, to November 10, 1891, appellee switched to and from said car shops 1102 loaded cars,

for which it charged two dollars per car, and during the same period switched in like manner 330 empty cars, for which it charged fifty cents per car. It was proved, and not denied, that the prices so charged for switching were reasonable. The aggregate amount charged therefor was $2369, but a credit on this of $715.79 was allowed, because the switching of some of these cars, amounting to the latter sum, was improperly included in the tonnage charge, and the credit was properly given to prevent a double charge for the same service, thus leaving $1653.31, which was the amount allowed. It is contended, on behalf of appellant, that this balance, due as a switching charge, had been paid; but an examination of the evidence in the record satisfies us it had not been paid, either in whole or in part.

"Appellant, as we understand it, further insists that the terminal facilities at Mt. Vernon included the track to the Mt. Vernon Car Works, and the switching of cars to and from the shops could not be charged for, under the contract, as a separate and distinct item, at so much per car, but the expense of such service must be estimated upon the tonnage basis, as provided in said contract. Our construction of the contract does not admit this interpretation. We must give it the meaning understood and intended by the parties at the time of its execution. Terminal facilities, as understood by those operating railroads, do not include tracks other than those used in making up trains, and the track put in upon the property of said car works company was not used for that purpose, did not belong to the appellee, and was not a part of its terminal facilities, as appears by the testimony of Dickson, division superintendent of appellee,—a witness qualified, by his experience and knowledge of such matters, to testify what the railroad men understood terminal facilities meant; and we presume those words were employed by the parties to the contract to be interpreted in accordance with such general understanding by railroad men. Moreover, at the time said contract

was executed the car works shops and tracks had not been built, nor, so far as appears by the evidence, was the building thereof then contemplated.   We hold that said car works track was not a part of appellee's terminal facilities, and switching cars over it, to and from the shops, was a service separate and distinct from those services mentioned or included in the contract, and that appellee is entitled to recover the amount such separate service was reasonably worth.

"It is further insisted, on behalf of appellant, that even if the trackage, depots, terminal facilities, supplies, etc., were furnished, as claimed, under the contract, and cars were switched to and from said car works shops as claimed, and appellee could maintain a suit therefor, yet appellant was not liable, but the Louisville and St. Louis Railway Company would be, because it was the successor of the Jacksonville Southeastern Railway Company, and because appellant never owned or operated any *railroad* until February 1, 1891, but the Louisville and St. Louis Railway Company built the road from Centralia to Drivers, and in the summer of 1888 absorbed the Jacksonville Southeastern railway and became its successor, and thereafter operated the two roads from Jacksonville to Mt. Vernon, and because appellant had no contract with appellee, and never ran a train over its road.

"It will be seen by referring to the contract between the appellant and the Jacksonville Southeastern Railway Company, dated May 12, 1888, that the latter party agreed, on behalf of itself *and its successors* and assigns, to comply with the terms thereof by it to be performed,—among other things, to pay the rents reserved, and other charges, for the term of five years, beginning April 15, 1888, and ending April 15, 1893, and thereafter, until abrogated by one year's written notice given by the party desiring to terminate said contract.   We have held in the case of *St. Louis and Cairo Railroad Co.* v. *East St. Louis and Carondelet Railway Co.* 39 Ill. App. 354, affirmed by the Supreme Court, (see 139 Ill. 401), that the right to op-

erate trains of one company over the railroad track of another necessarily includes the right to use the franchise of the latter, and such right could be lawfully leased by the owner of the railroad track to another corporation. And we also, in the case cited, held, that if, after a railway company has given a deed of trust upon its property and franchise, it leases from another company the right to use its track, and afterwards the deed of trust is foreclosed and the property and franchise are sold under the decree in foreclosure to a third company, which continues to use the leased track in the same manner the lessee had done, such purchaser so using the track is liable to pay the rent agreed to be paid by the lessee to the lessor, as provided in the contract, and is bound by the terms thereof. In the case at bar, if the record discloses the facts to be that the appellant was the successor of the Jacksonville Southeastern Railway Company, and used the track, depots and terminal facilities of appellee, and was furnished by it, and used, labor, materials and supplies, as charged, then appellant was liable to pay for the same in accordance with the terms of the contract, and was bound thereby the same as though it had executed the contract originally.

"We are satisfied the evidence warranted the jury in finding that appellant was the successor of the original lessee, and operated its trains over appellee's track, had the benefit of appellee's franchise, and the use of its depots and terminal facilities, and was furnished by appellee with labor, materials and supplies, in the same manner its predecessor had been; that the switching service charged as a separate item was performed by appellee for appellant, and the latter was liable therefor.

"Appellant was incorporated January, 1890, and the purpose, as shown by the articles of incorporation, was to lease *or purchase, own and operate,* a railway through the several named counties to Centralia. On July 1, 1882, the Jacksonville Southeastern Railway Company, then owning the railway

completed from Jacksonville to Litchfield, and desiring to extend it to Centralia, gave a trust deed, executed by its president, William S. Hook, to secure the payment of money loaned for the purpose of building such extension.   The debt so secured was evidenced by the bonds of the company, and was, by the terms of the deed, made a lien on the railway from Jacksonville to Centralia, and all the corporate property and franchises then owned, or that were thereafter acquired, by the company.   This deed of trust was foreclosed at the February term, 1890, of the Marion circuit court, and by virtue of the decree entered in that proceeding, the master in chancery sold all the mortgaged property to a committee, representing the mortgage creditors, who paid the full amount of their bid, except $11,205 paid in cash, in the bonds secured by the trust deed, and received the master's deed for the property sold, October 4, 1890.   On January 23, 1891, this committee, in consideration of the payment to them of $1,-187,200 in the first consolidated mortgage bonds of the appellant, conveyed all of said property to William Elliott, and he, on the same day, deeded all of said property to the appellant, in consideration of $1,180,200 paid in said first consolidated mortgage bonds, and $1,500,000 paid in the capital stock of appellant, and it became the owner of all the railway from Jacksonville to Centralia, and all the property and franchises the Jacksonville Southeastern Railway Company had formerly owned.   This last named company ceased to exist on October 4, 1890, by reason of the sale then made of all its property, and we think the evidence in the record (which is not fully set forth in the abstract) justified the jury in finding that appellant became its successor on that date, and operated freight and passenger trains over the entire line from Jacksonville and Springfield to Mt. Vernon during all the period within which the indebtedness sued for had accrued.

"The circumstances attending the master's sale, the character of the payments made to him, the subsequent convey-

ances by the bidders to Elliott and by him to appellant, both made on the same day, the fact that the mortgage bonds of appellant formed the entire consideration for the conveyance to Elliott and a large part of the consideration for the conveyance to appellant, and the further fact that William S. Hook was the president of the Jacksonville Southeastern Railway Company and one of the incorporators of appellant company, incorporated January 18, 1890,—one month before the said foreclosure proceedings were commenced,—for the express purpose of purchasing the railway property and franchises sold by the master, all indicate that the purchase was made, at the sale, for appellant, in pursuance of a previous arrangement to accept its mortgage bonds in payment of the debt secured by the deed of trust, and permit appellant, from the day of sale, to enter into the possession of and operate its trains over the railway that was sold.    Furthermore, there was evidence tending to prove that William S. Hook was the president of appellant, and notwithstanding he denied the fact, yet if the jury believed the witnesses for appellee, they could properly find he was such president, and it is admitted Marcus Hook was the auditor of appellant.    It also appears the summons in this case was served on Lutz as agent of appellant, and it is·not denied he was its agent at Mt. Vernon.

"In addition to the evidence already mentioned, the evidence of Lutz and Dickson, the depositions of Knott and Seawell, and the letters of Marcus Hook, as auditor, attached as exhibits thereto, the statements of William S. Hook and his official correspondence as president, and that of Marcus Hook as auditor of appellant, with the officers of appellee, warranted the finding that from and after October 4, 1890, and during the entire period within which the indebtedness sued for accrued, appellant was the successor of the lessee in the contract of April 15, 1888, claiming the same rights said lessee acquired thereby, and, as such successor, recognizing the said contract as existing and binding upon it, used the

track and franchises of appellee between Drivers and Mt. Vernon, and its depots and terminal facilities there, and the labor, materials and supplies furnished by appellee, as charged, in operating its trains and carrying on its railway business, and that the switching service before mentioned was performed by appellee for the appellant, as claimed. The amount recovered, comprising the several items as set out in this opinion, was due and owing to appellee, and the jury rightfully found appellant liable therefor.

"We find no reversible error in the ruling of the court in admitting or refusing to admit evidence.

"The claim by appellant that the Louisville and St. Louis Railway Company was the successor of the lessee in said contract, and operated the trains over appellee's track, and used the terminal facilities, labor, supplies and materials furnished by appellee, is not supported by the evidence. The Louisville and St. Louis Railway Company owned no engines, cars or equipments and operated no trains.

"The first instruction given for plaintiff is as follows:

" 'No. 1. If the jury believe, from the evidence, that the defendant is the successor of the Jacksonville Southeastern Railway Company, and as such successor came into the possession of the property, rights and franchises of the Jacksonville Southeastern Railway Company, and that the defendant, since it first came into possession of the railway formerly owned by the Jacksonville Southeastern Company, had been operating such railway and running its trains over the railroad of the plaintiff between Drivers station and Mt. Vernon and between Mt. Vernon and Drivers station, and using the terminal facilities of the plaintiff for freight and passenger business at Mt. Vernon, and has been furnished with supplies and materials and labor and services about the transaction of its business by the plaintiff while it was operating its trains over plaintiff's road between the places above mentioned, and defendant has claimed the right, under contract of April 15,

1888, between the plaintiff and the Jacksonville Southeastern Railway Company, to operate its trains over plaintiff's railroad between the places above mentioned, and to use plaintiff's terminal facilities at Mt. Vernon for the transaction of its freight and passenger business, then the defendant is liable to the plaintiff for whatever sum you find, from the evidence, to be due under the contract of April 15, 1888, for rent of track, terminal facilities, supplies and materials, labor and services furnished, if any, by the plaintiff from the time defendant first commenced to operate and run its trains over plaintiff's railroad until May 31, 1891.'

"Appellant complains of this instruction, and insists it was calculated to mislead the jury; that 'it was intended by the court that the jury should understand it as laid down as law, that the Jacksonville, Louisville and St. Louis Railway Company, by virtue of the several conveyances, thereby became liable to the Louisville and Nashville Railway Company.' We do not think the court gave the instruction with the intent the jury should so understand it, or that they did so understand it. On the contrary, nothing in the instruction conveys such meaning, but it is therein clearly stated that, to entitle plaintiff to recover *under the contract of April 15, 1888*, certain facts must be first proven. It was intended to inform the jury that plaintiff had a right to recover under the specific contract set up in said special count of the declaration, provided such proof was made. Evidence was introduced strongly tending to prove the several facts stated in the instruction, hence it was based on evidence, and the plaintiff was entitled to have it given to the jury as a correct proposition of law when applied to a certain state of fact.

"What has been already said will apply to the objections made by appellant to the second instruction given for plaintiff.

"The plaintiff's sixth instruction is more voluminous than was necessary, but was not calculated to mislead the jury. They must have understood by it, that if, from the evidence,

they found defendant, in conducting and carrying on its freight and passenger traffic, used the track of plaintiff between Drivers and Mt. Vernon, and its depot and terminal facilities there, defendant was liable to pay plaintiff, for such use and occupation, the amount they found, from the evidence, such use and occupation were reasonably worth. This was the law in that state of fact. Under the common counts plaintiff was not bound to prove a special contract in order to recover a reasonable price for the use and occupation of its property.

"Plaintiff's seventh instruction could not have prejudiced defendant, but imposed upon plaintiff the burden of proving the assignment to it of the contract of lease before it would be entitled to recover. This was requiring more of plaintiff than was necessary. If plaintiff and defendant recognized and acted under said contract as a valid and binding contract between them during the time defendant used and occupied plaintiff's property, no formal assignment of the contract was necessary to a recovery under it by plaintiff for a breach of its conditions.

"The refusal by the court to give the seventh, eighth, ninth and tenth instructions, asked for on behalf of defendant, is also assigned as error. The seventh had no proper application to the facts proven, and was properly refused. The eighth instruction was calculated to mislead the jury, and was not based on the evidence. It was not error to refuse it. The ninth instruction was misleading and superfluous. The jury had full and correct information given it by the court touching the same matters in the first, second and third instructions given on behalf of plaintiff, and it was not necessary to a fair trial that the same should be repeated. The court did not err in refusing to give defendant's ninth instruction. The tenth refused instruction does not state the law, as we understand it, and ought not to have been given.

"We find no reversible error in giving the instructions on behalf of plaintiff, or refusing to give those which the court refused to give for defendant.

"The judgment is affirmed."

Finding no substantial error in the record, the judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*